IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGIA G. BARNHART, | ) | CASE NO.  5:19-cv-01236 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | KATHLEEN B. BURKE |
| SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Georgia Barnhart ("Plaintiff" or "Barnhart") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her application for social security disability benefits.  Doc. 1. This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate

Judge for a Report and Recommendation pursuant to Local Rule 72.2.   For the reasons

explained herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's

decision.

## I.  Procedural History

Barnhart filed an application for Disability Insurance Benefits ("DIB") on March 19,

2013.  Tr. 106, 129, 1575.  Barnhart alleged a disability onset date of April 26, 2012.  Tr. 106,

1509, 1575.   She alleged disability due to Type I diabetes, brittleness, blind from diabetes,

hypoglycemia, migraines, neuropathy, optic nerve damage, legal blindness, depression, prior

heart attacks, prior ketoacidosis, prior pancreatitis, high blood pressure, and PTSD.  Tr. 152, 158.

Barnhart's applications were denied initially (Tr. 151-154) and upon reconsideration by the state

1

agency (Tr. 158-164).   Thereafter, she requested an administrative hearing.  Tr. 166-167.  On

August 20, 2015, an Administrative Law Judge ("ALJ") conducted a hearing.  Tr. 34-85.

On January 25, 2016, the ALJ denied benefits, finding that Barnhart had not been under a

disability within the meaning of the Social Security Act from April 26, 2012, through the date of

the decision.  Tr. 1572-1591.  Barnhart requested review of the ALJ's decision by the Appeals

Council.  Tr. 1672.  On November 7, 2016, the Appeals Council denied Barnhart's request for

review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1591-1597.

Barnhart filed an appeal in the U.S. District Court for the Northern District of Ohio, Case

No. 5:17-cv-00052, resulting in a remand to the Commissioner because the decision did not

contain an adequate evaluation of Barnhart's mental residual functional capacity ("RFC") and

medical opinions of record.  Tr. 1598, 1600.  Pursuant to the court's remand order, on September

11, 2017, the Appeals Council remanded the case to an ALJ for further proceedings consistent

with the Court's order.  Tr. 1598-1602.

Following issuance of the remand order, the same ALJ conducted a hearing on January

30, 2018.  Tr. 1531-1570.  On March 30, 2018, the ALJ denied benefits, finding that Barnhart

had not been under a disability within the meaning of the Social Security Act from April 26,

2012, through the date last insured.  Tr. 1506-1530.  Barnhart filed exceptions to the ALJ's

decision on April 27, 2018, raising issues with the ALJ's evaluation and weighing of the state

agency psychological consultants' opinions.  Tr. 1496, 172-1721.  The Appeals Council

considered the exceptions (Tr. 1496-1502) and, on March 26, 2019, found no reason to assume

jurisdiction (Tr. 1496).  Thus, the ALJ's March 30, 2018, decision became the final decision of

the Commissioner after remand by the court.  Tr. 1497.  On May 30, 2019, Barnhart appealed the

ALJ's March 30, 2018, decision to this Court.  Doc. 1.

## II. Evidence[1]

### A.  Personal, vocational and educational evidence

Barnhart was born in 1982.  Tr. 1627.  At the time of the 2018 hearing, Barnhart was living in her house with her husband, two minor stepchildren, and her minor neice and nephew. Tr. 1540-1541.  Barnhart graduated from high school and attended some school following high school.  Tr. 1542.  She worked at Walmart for about four years and last worked there in 2011. Tr. 1542, 1631.

### B.  Medical evidence

#### 1.  Treatment history

On March 6, 2013, Barnhart was seen at Summa Ophthalmology for an eye examination. Tr. 566-567.  She had been referred due to her diabetes.  Tr. 567.  She complained of decreased visual acuity with sharp pain that occurred off and on and flashes.  Tr. 567.  Her last eye examination had been a year earlier.  Tr. 567.  It was noted that, in May 2011, Barnhart was hospitalized and in coma when her sugar levels were around 1100.  Tr. 567.  The eye examination assessment was decreased visual acuity; migraines; dry eye; and dependent diabetes mellitus without retinopathy.  Tr. 566.  The individual providing the assessment noted that the etiology was unclear.  Tr. 566.  Follow up with a neurologist was recommended.  Tr. 566.

On April 8, 2013, Barnhart returned to Summa Ophthalmology for follow up. Tr. 565. Barnhart complained of worsening visual acuity.  Tr. 565.  The ophthalmologist noted that, while Barnhart reported only being able to see light during one of the tests given using the same prescription as her glasses, Barnhart was able to see 20/100 with her glasses when she was

---

[1] In this appeal, Barnhart challenges the ALJ's decision regarding her alleged visual impairment and fibromyalgia. Thus, the evidence summarized herein is generally limited to evidence relating to those impairments.

checked by a technician.  Tr. 565.  Barnhart refused additional testing suggested by the ophthalmologist and left her appointment with the examination not completed.  Tr. 565.

On April 15, 2013, Barnhart saw Dr. Rishi Singh, M.D., at the Cleveland Clinic, Ophthalmology Department for complaints of blurred vision in both eyes.  Tr. 574.  Testing indicated that Barnhart's distance visual acuity was 20/800 in the right eye and 20/600 in the left eye.  Tr. 578.  During testing, Barnhart commented that the letters looked cloudy with both eyes and the letters looked distorted like someone had colored outside the lines.  Tr. 578.  The assessment was diabetes mellitus with no signs of significant diabetic retinopathy and unexplained vision loss.  Tr. 579.

On June 10, 2013, Barnhart saw Dr. Vinni Makin, M.D., for an assessment regarding her diabetes.  Tr. 874.  Barnhart noted that she was concerned because she was having frequent episodes of hypoglycemia.  Tr. 874.  Dr. Makin discussed a treatment plan with Barnhart and recommended follow up in about six weeks.  Tr. 876-877.

On June 11, 2013, Barnhart saw Dr. Frederick Wilson, D.O., at the Cleveland Clinic in the Spine Medicine Department for a consultation regarding Barnhart's low back pain.  Tr. 748.  Barnhart reported having low back pain for years.  Tr. 748.  She had been seeing a chiropractor.  Tr. 748.  Barnhart's chiropractor informed her that one leg was shorter than the other, which Barnhart thought could be causing her low back pain.  Tr. 748.  Barnhart also reported pain in other areas of her back, neck and knee.  Tr. 748.  Barnhart also relayed that she had juvenile diabetes mellitus and peripheral neuropathy.  Tr. 748.  Dr. Wilson assessed myofascial pain, fibromyalgia.  Tr. 751.  Dr. Wilson recommended a trial of Lyrica with a follow up in one month.  Tr. 751.

On June 25, 2013, Barnhart saw Dr. Mary E. Margocs DiDonato, D.O., to establish care and to address her diabetes.  Tr. 629.  Barnhart relayed her history regarding diabetes.  Tr. 629.  She also reported having a history of migraines since she was eight years old.  Tr. 629.  Also, Barnhart reported that her spine doctor, Dr. Wilson, had diagnosed fibromyalgia.  Tr. 629.  He had provided her with Lyrica but Barnhart had not taken it yet.  Tr. 629.  Dr. DiDonato assessed diabetes mellitus 1 with hypoglycemic episodes; headaches; and fibromyalgia.  Tr. 631.

On July 30, 2013, Barnhart saw Dr. David H. Krahe, D.O., for a new patient visit regarding her bilateral knee pain.  Tr. 706.  Barnhart relayed that she had had knee pain for 15-20 years.  Tr. 706.  Barnhart lost approximately 220 pounds over the prior five years and, since having lost the weight, she noticed improvement in her knee pain but more recently she noticed that her knee pain was worsening.  Tr. 706.  Dr. Krahe's impression was bilateral patellofemoral joint syndrome.  Tr. 706.  He recommended Celebrex and physical therapy with follow up in 4-6 weeks.  Tr. 706.

Barnhart saw Dr. Makin for follow up regarding her diabetes on August 13, 2013.  Tr. 922.  Barnhart reported having blurry vision and she was not driving.  Tr. 922.  Her last eye appointment was in April 2013.  Tr. 922.  Dr. Makin assessed Type 1 diabetes, uncontrolled with neuropathy, noting that it was under better control since changing insulin doses.  Tr. 923.  Dr. Makin made adjustments to Barnhart's medications and recommended a consult with ophthalmology.  Tr. 923.

Upon Dr. Makin's request, on August 20, 2013, Barnhart saw Dr. Michael E. Millstein, M.D., at the Cleveland Clinic, Ophthalmology Department for a consult.  Tr. 693-698.  Barnhart reported that she was legally blind due to a diabetic coma in Mary 2011 with blood sugar of 1136.  Tr. 693.  Associated symptoms included blurred vision, decreased vision, difficulty

driving, difficulty reading, and difficulty watching television.  Tr. 693.  Barnhart reported that she used the color of her husband's clothes to follow him when in public.  Tr. 693.  Barnhart indicated she could not see well enough to perform normal everyday activities.  Tr. 693.  Barnhart also reported frequent migraines and eye pain.  Tr. 693.  An examination showed that Barnhart's distance visual acuity was 20/1600 in both eyes.  Tr. 697.  Dr. Millstein assessed loss of visual acuity in both eyes.  Tr. 697.  Dr. Millstein recommended that Barnhart see another physician for a final opinion and if no other pathology for her visual problems was determined, Dr. Millstein noted that Barnhart should consider a psychiatric referral.  Tr. 697-698.

On August 21, 2013, Barnhart saw Dr. Wilson for a follow-up visit regarding her neck and back pain.  Tr. 1448.  Barnhart reported that Lyrica had been helping with her pain but she wanted to stop taking it because she was trying to get pregnant.  Tr. 1448.  Dr. Wilson observed a normal range of motion in the lumbar spine with pain on flexion and extension.  Tr. 1448.  Dr. Wilson noted 9 out of 16 tender points and assessed fibromyalgia.  Tr. 1448.  Barnhart was weaning off of Lyrica and Dr. Wilson recommended that Barnhart try Nortriptyline but indicated that Barnhart should try not to get pregnant while taking Nortriptyline.  Tr. 1448.

Upon Dr. Millstein's referral, on October 2, 2013, Barnhart saw Dr. Lisa D. Lystad, M.D., at the Cleveland Clinic Ophthalmology Department.  Tr. 842-847.  Barnhart reported vision loss in both eyes, blurred vision, difficulty driving, difficulty reading, difficulty watching television, dryness in her eyes, floaters, problems with glare, photophobia, puffy eyes, and inability to meet visual needs of job.  Tr. 842.  On examination, it was difficult for Barnhart to count fingers; she could see Dr. Lystad's hand in front of her face; and her eyes could follow hand movement.  Tr. 846.  Dr. Lystad's assessment was functional vision loss but she noted that visual acuity testing was suggestive of at least 20/50-20/70 in both eyes.  Tr. 847.  Dr. Lystad

also assessed background diabetic retinopathy, with microaneurysms in the left eye; and Type 1 juvenile onset diabetes mellitus. Tr. P. 847.  Dr. Lystad ordered a VEP (Visual Evoked Potential) to test Barnhart's optic nerve function.  Tr. 847, 905.

Barnhart also saw Dr. Wilson on October 2, 2013.  Tr. 1445.  Barnhart relayed that about six weeks earlier she had developed numbness in her lateral calf and top of her right foot.  Tr. 1445.  Barnhart had never had an MRI of her lumbar spine.  Tr. 1445.  Barnhart reported a lot of pain in her upper back and left hip.  Tr. 1445.  Dr. Wilson observed 11 out of 18 tender points and decreased sensation to pinprick in L5 area.  Tr. 1445.  Dr. Wilson assessed right leg numbness, fibromyalgia, and low back pain.  Tr. 1445.  Dr. Wilson recommended an MRI of the lumbar spine; discontinued Nortriptyline; and prescribed Cymbalta, 30 mg in the morning.  Tr. 1445.

On October 10, 2013, Barnhart had the VEP performed.  Tr. 905-906.  The VEP showed no evidence of a lesion in the anterior visual pathways.  Tr. 905.

Barnhart saw Dr. Makin for follow up regarding her diabetes on November 19, 2013.  Tr. 927-930.  Barnhart's diabetes continued to be under better control since her insulin had been changed but she was still having late night hypoglycemia.  Tr. 930.  Dr. Makin adjusted Barnhart's medication and recommended that she have a small protein snack at bedtime.  Tr. 930.

During 2014 and 2015, Barnhart saw Dr. Jon Oliverio, DPM, at the Foot and Ankle Institute for wounds on her feet, pain in her toes, bilateral lower extremity neuropathy, plantar fasciitis, and gout.  Tr. 1330, 1332, 1334, 1335, 1336, 1337, 1339, 1340, 1341-1342.  Dr. Oliverio noted loss of protective senses bilaterally.  Tr. 1342.  Barnhart's gait was normal.  Tr.

1342.  Dr. Oliverio discussed with Barnhart the effects of her diabetes and the importance of regular visits.  Tr. 1342.

On February 6, 2014, Barnhart aw Katelyn Obermiller, FNP-BC, with the Trinity Medical Group, to establish care.  Tr. 1175-1179.  Nurse Obermiller reviewed Barnhart's medical history and assessed multiple medical conditions, including nonproliferative diabetic retinopathy and fibromyalgia.  Tr. 1177.  Nurse Obermiller planned to help Barnhart find a local optometrist.  Tr. 1177.  Nurse Obermiller recommended that Barnhart continue taking Cymbalta for her fibromyalgia and also recommended that she start taking Gabapentin, noting that Barnhart reported that Cymbalta was not helping control her pain as it had in the past.  Tr. 1178.  X-rays of the right foot and bilateral knees were taken and showed no significant osseous abnormalities.  Tr. 1180-1182.  Barnhart continued to treat with Nurse Obermiller throughout 2014 and 2015 for various conditions.  Tr. 1082-1085, 1092, 1095, 1098-1099, 1101-1103, 1108-1110, 1117-1118, 1121-1123, 1141-1142, 1155-1156, 1164-1166, 1167-1169, 1170-1172, 1764.  During a February 11, 2014, visit, Barnhart wanted to stop the Cymbalta due to side effects and she wanted to stop the Gabapentin because she did not think it was helping.  Tr. 1172.  Nurse Obermiller recommended that Barnhart taper off the Cymbalta and then try a new medication.  Tr. 1172.  In March 2014, Barnhart saw Nurse Obermiller reporting a diagnosis of shingles and complaining of migraines.  Tr. 1141, 1155.  In August 2014, Barnhart complained of shoulder pain for which she received some physical therapy and was seen by a pain management specialist.  Tr. 1098, 1101.  In October 2014, Barnhart reported that her shoulder pain had improved.  Tr. 1098.  On December 11, 2014, Barnhart saw Nurse Obermiller for a left knee injection and a referral to ortho.  Tr. 1092.

On April 22, 2014, Barnhart saw Dr. Thomas A. Perkowski, M.D, of Vision Care Associates, regarding her diabetic eye health. Tr. 1047-1050. Barnhart relayed that her vision had been getting progressively worse. Tr. 1048. Dr. Perkowksi observed a significant visual field defect but noted that Barnhart's diminished vision was "out of proportion to signs[.]" Tr. 1050.

During an office visit at Endocrine Associates, Inc. on April 29, 2014, regarding Barnhart's diabetes, Barnhart relayed that her vision was too poor to be able to see the glucometer reading. Tr. 1354. Her physician recommended that she use a meter that was easier for her to see and provided her with a sample meter to use. Tr. 1354.

On June 18, 2014, Barnhart was seen by Dr. Charles Barrett, D.O., at the pain management center at Union Hospital Association for a consultation. Tr. 1295-1296. Dr. Barrett's examination of Barnhart's cervical spine showed some mild pain with cervical extension and moderate trigger points were identified in the trapezius muscle. Tr. 1295. Dr. Barrett's examination of Barnhart's upper and lower extremities revealed decreased sensation. Tr. 1296. Barnhart had tried opioid therapy but was "afraid of addiction[.]" Tr. 1295. She had also tried physical therapy but it caused her pain to increase. Tr. 1295. Dr. Barrett's assessment was insulin-dependent diabetic neuropathy and fibromyalgia. Tr. 1296. Dr. Barrett noted that Barnhart had recently been provided a prescription for Ultram at the emergency room because Barnhart had hurt her wrist. Tr. 1296. Dr. Barrett provided Barnhart with a new prescription for Ultram and indicated that Barnhart should follow up in 8 weeks. Tr. 1296.

On August 28, 2014, Barnhart was seen at the Union Hospital pain management center by Staci Marshall, C.N.P., for her fibromyalgia pain but her chief complaint during her visit was her "frozen shoulder" pain. Tr. 1293. Barnhart relayed that she received prescriptions for

Toradol IM and Vicodin from her primary care physician.  Tr. 1293.  Nurse Marshall cautioned Barnhart that she could only receive pain medication from the pain management center.  Tr. 1293.  Barnhart was informed that, if she continued to receive pain medication from others, she would be discharged from the pain management center.  Tr. 1293.  Barnhart reported that Ultram provided her with no relief.  Tr. 1293.  Nurse Marshall prescribed Percocet because the Vicodin was not helping her shoulder pain and approval for a shoulder MRI was going to be sought.  Tr. 1293.

During a follow-up visit at the pain management center with Nurse Marshall on September 10, 2014, Barnhart complained of shoulder pain, pain all over, and fibromyalgia.  Tr. 1291.  Barnhart refused to move her shoulder during the examination due to frozen shoulder and pain.  Tr. 1291.  Nurse Marshall observed trigger points on multiple points in her body during her examination.  Tr. 1291.  Nurse Marshall adjusted Barnhart's pain medication, ordered an MRI, and made another ortho referral for the shoulder.  Tr. 1291.  A shoulder MRI taken on September 18, 2014, showed mild supraspinatus tendinopathy with no evidence of rotator cuff tear.  Tr. 1285.

When Barnhart saw Nurse Marshall on October 16, 2014, on examination, Nurse Marshall observed no pinpoint pain over the cervical, thoracic or lumbar spine; no SI joint pain; decent range of motion of the right shoulder; gait was fairly normal; and Barnhart was able to walk on her own.  Tr. 1283.  Nurse Marshall's assessment was insulin-dependent diabetes with neuropathy, right shoulder pain, osteoarthritis of knees, and fibromyalgia.  Tr. 1283.  Nurse Marshall refilled Barnhart's Percocet and recommended follow up in 10-12 weeks unless Barnhart needed anything sooner.  Tr. 1283.  During a December 18, 2014, visit with Nurse Marshall, Barnhart reported that her right shoulder was doing much better.  Tr. 1281.  She was

starting to have problems with her left shoulder and was interested in physical therapy to help with that pain.  Tr. 1281.  She continued to report knee pain and bilateral foot pain related to diabetes.  Tr. 1281.  Nurse Marshall continued Barnhart's Percocet and planned to refer her to physical therapy for pain and decreased range of motion in the left shoulder.  Tr. 1281.

Barnhart continued to see Nurse Marshall at the pain management center in 2015.  Tr. 1279, 1280, 2020, 2022.  During a May 28, 2015, visit, Barnhart complained of joint pain, all-over pain, and neuropathy and she was recovering from abdominal surgery"[2] that she had four months earlier.  Tr. 1279.  On examination, Nurse Marshall observed no pinpoint pain over the cervical, thoracic, or lumbar spine; no SI joint pain; multiple joint pains including knee and elbow; and trigger points throughout the body.  Tr. 1279.

Barnhart also continued treatment with the Trinity Medical Group for her reports of pain.  Tr. 1073.  On July 8, 2015, she saw Dr. Muhammad Ashraf, M.D., with her chief complaint being her left shoulder.  Tr. 1073.  She also reported a history of back and right shoulder pain and diabetes.  Tr. 1073.

Barnhart continued treatment at the pain management center in 2016.  Tr. 2012, 2014, 2015, 2018.  On February 2, 2016, Barnhart relayed to Nurse Marshall for the first time that she had juvenile rheumatoid arthritis.  Tr. 2018.  Barnhart indicated she had received that diagnosis when she was 11 years old.  Tr. 2018.  She also relayed having been diagnosed with Usher Syndrome type 3.  Tr. 2018.  Nurse Marshall indicated she was going to try to get some records from Barnhart's primary care physician to "put everything together."  Tr. 2018.  Barnhart requested a handicap placard due to her various joint issues.  Tr. 2018.  Barnhart was taking Percocet for her fibromyalgia pain and back and knee pain.  Tr. 2018.  Barnhart indicated that the

---

[2] The surgery was cosmetic surgery due to Barnhart's dramatic weight loss.  Tr. 1283.

11

Percocet helped with her pain without giving her a lot of side effects.  Tr. 2018.  Nurse Marshall's examination revealed no pinpoint pain over the cervical, thoracic, or lumbar spine; no SI joint pain; increasing pain with range of motion of the knees; multiple trigger points noted through the body; and no joint deformities.  Tr. 2018.  During an April 12, 2016, visit, Nurse Marshall observed that Barnhart had an antalgic gait due to knee pain and she exhibited a decreased range of motion of the lumbar spine due to pain especially with extension.  Tr. 2015.  There was no pinpoint pain indicative of compression fracture.  Tr. 2015. Nurse Marshall recommended that Barnhart see the Crystal Clinic for her knee pain.  Tr. 2015.  During a June 23, 2016, visit, Nurse Marshall observed that Barnhart had difficulty rising and difficulty with ambulation due to stiffness and pain in her knees, hips and back but Barnhart was able to walk on her own.  Tr. 2014.

On January 11, 2017, Barnhart had arthroscopic surgery on her right knee at the Crystal Clinic.  Tr. 2073.  She underwent arthroscopic surgery on her left knee on May 3, 2017, at the Crystal Clinic.  Tr. 2123.

Barnhart continued to see Nurse Marshall at the pain management center during 2017.  Tr. 2002, 2003, 2004, 2005.  During her March 15, 2017, visit with Nurse Marshall, Barnhart relayed that her right knee had improved a lot following her surgery.  Tr. 2005.  Also, Botox injections were helping her with her migraines.  Tr. 2005.  During a May 31, 2017, visit, Barnhart informed Nurse Marshall that her left knee was doing well following surgery but she reported some problems with her right knee.  Tr. 2004.  She also complained of back pain and had neuropathy in the bilateral lower extremities from her diabetes.  Tr. 2004.  She exhibited a decreased range of motion of the lumbar spine.  Tr. 2004.  Barnhart continued to treat her pain with Percocet and she was also taking Flexeril for muscle spasms.  Tr. 2002, 2004.  During an

October 18, 2017, visit, it was noted that Percocet and Flexeril kept her functional at home and she was able to take care of her kids.  Tr. 2002.

### 2. Opinion evidence

On December 18, 2013, Dr. Makin completed a questionnaire regarding Barnhart's social security disability claim.  Tr. 942-944.  Dr. Makin listed Barnhart's diagnosis as "diabetes on insulin – likely type 1 secondary to pancreatitis."  Tr. 943.  Dr. Makin reported that Barnhart was diagnosed in May 2011 and he described her condition as "brittle diabetes with severe hypoglycemia unawareness."  Tr. 943.  With respect to findings on clinical examination, Dr. Makin indicated that Barnhart had no sensation in her feet and she was missing her toenail on her left big toe.  Tr. 943.  With respect to Barnhart's eyes, Dr. Makin stated: "has a regular eye exam with ophthalmologist – please provide his note."  Tr. 943.  When asked about future surgical plans, Dr. Makin noted that Barnhart "might need regular foot care & surgical treatment if necessary but none planned now."  Tr. 943.  When asked about any limitations caused by Barnhart's impairments, Dr. Makin indicated that there were "no issues with sitting, standing, walking but may have issues with lifting & grasping because of vision.  Please contact ophthalmology for more information."  Tr. 944.

On December 18, 2013, Barnhart was examined by Dr. Aly Zewail, M.D., and Dr. Zewail completed a Basic Medical and Consultative Exam form in connection with Barnhart's application for Medicaid benefits.  Tr. 1314-1319.  On physical examination, Dr. Zewail observed paresthesia in Barnhart's hands and feet.  Tr. 1316.  Dr. Zewail opined that Barnhart was extremely limited in her ability to see, noting that she had an "extreme limitation with correction glasses, due to diabetic retinopathy."  Tr. 1318.  Dr. Zewail was asked to rate Barnhart's ability to perform various activities of daily living.  Tr. 1319.  In response, Dr. Zewail

13

opined that Barnhart was "able" to perform the following activities: bathing, dressing, bowel/bladder control, and climb stairs.  Tr. 1319.  Dr. Zewail opined that Barnhart could perform the following activities "with help": laundry, shopping, and manage medications.  Tr. 1319.  Dr. Zewail opined that Barnhart was "not able" to perform the following activities: fine motor skills, use public transportation, household chores, cooking, and manage finances.  Tr. 1319.

On November 18, 2015, Dr. Barbara J. Barchiesi, M.D., of Canton Ophthalmology Assoc., completed an ophthalmological/optometric consultative evaluation.  Tr. 1481-1489.  On examination, Barnhart was only able to count fingers, i.e., she was unable to read the largest letter on the Snellen chart from any distance.  Tr. 1481.  Dr. Barchiesi noted that the visual acuity testing was not consistent with findings because Barnhart was able to tolerate light from indirect ophthalmoscope and she was able to ambulate around corners and grasp objects without assistance.  Tr. 1481.   On examination, Dr. Barchiesi indicated that the visual fields as plotted were abnormal.  Tr. 1482.  Dr. Barchiesi observed that the visual fields as plotted were not consistent with findings because Barnhart was able to reach for objects and move around the office without assistance.  Tr. 1482.  Dr. Barchiesi remarked that there was no diabetic retinopathy viewed at the time.  Tr. 1482.  There was myopia and astigmatism in both eyes.  Tr. 1482.  When asked how Barnhart's visual impairment affected her ability to perform work-related activities, such as driving, reading, working at heights, or other hazardous situations, Dr. Barchiesi stated "no visual impairment noted."  Tr. 1482.

On December 23, 2015, Maggie Bucher, D.O., of Dr. R.E. Hults & Associates completed a Vision Impairment Medical Source Statement.  Tr. 1492-1495.  Dr. Bucher indicated that she saw Barnhart in 2015 for a 30 minutes examination.  Tr. 1493.  Barnhart was also seen in 2012.

Tr. 1493.  Dr. Bucher listed the following diagnoses – night blindness and legally blind OU,

meaning in both eyes.[3]  Tr. 1493.  Dr. Bucher indicated that she sent Barnhart for a low vision

evaluation to determine if her vision could be improved.  Tr. 1493.  Dr. Bucher recorded

Barnhart's visual acuity after best correction as "20/200 w/ pinhole" in both eyes.  Tr. 1493.

When asked to describe any contraction of Barnhart's peripheral visual fields, Dr. Bucher stated

visual fields "constricted OU as confirmed with automated visual fields."  Tr. 1493.  She added

that Barnhart's visual fields were also constricted in 2012 with no improvement.  Tr. 1493.  Dr.

Bucher reported that Barnhart had the following vision symptoms: light sensitivity OU; blur at

distance and near OU; flashes of light and floaters in vision; reported loss of side vision; and

migraines.  Tr. 1493.  Dr. Bucher opined that Barnhart could occasionally perform work activity

involving color vision; she could rarely perform work activity involving near acuity, far acuity,

and accommodation; and she could never perform work activity involving depth perception or

field of vision.  Tr. 1494.  Dr. Bucher opined that Barnhart was not capable of avoiding ordinary

hazards in the workplace such as boxes on the floor, doors ajar or approaching people or

vehicles.  Tr. 1494.  Dr. Bucher opined that Barnhart had difficulty walking up or down stairs;

she could not work with small objects such as those involved in doing sedentary work; and she

could possibly work with large objects.  Tr. 1494.  Dr. Bucher also opined that Barnhart's

symptoms would interfere with her attention and concentration necessary to perform even simple

work tasks causing her to be off task for 25% or more of the workday.  Tr. 1494.

**C.**     **Testimonial evidence**

    **1.**     **Plaintiff's testimony**

---

[3] The abbreviation "OU" stands for oculus uterque or both eyes.  *See* https://www.aao.org/young-ophthalmologists/yo-info/article/ophthalmic-abbreviations-101 (last visited 10/26/2020).

Barnhart was represented and testified at the August 20, 2015, (Tr. 1620-1671), and January 30, 2018, (1531-1570), hearings.

*August 2015 hearing*

Barnhart relayed that she had not had a driver's license since January 2013. Tr. 1629. Barnhart indicated that, after she got married, she changed her name and had to get a new state identification card. Tr. 1629. As part of that process, Barnhart had to take a vision test at the DMV and she failed it. Tr. 1629. Although Barnhart had a driver's license through January 2013, she had not driven since August 2012. Tr. 1630. She stopped driving at that time because she was driving and came very close to being in an accident. Tr. 1637. As far as her vision problems, Barnhart explained that she just sees blurry colors. Tr. 1651.

Barnhart was able to read large print books from the library with a magnifying glass. Tr. 1637-1638. After trying to read for about 30-40 minutes, Barnhart starts to get a migraine. Tr. 1638. If her children ask her to watch television with her, she will try to listen to it. Tr. 1638.

In 2011, when Barnhart was working at Walmart, she was diagnosed with diabetes. Tr. 1631. She was out of work for about 6-8 weeks because of very high blood sugar. Tr. 1631. When she returned to work, she was on a very limited hourly schedule but continued to have problems with her blood sugar and had to call off from work. Tr. 1631-1632. She was ultimately terminated for absenteeism. Tr. 1632. When asked what would prevent her from working, Barnhart explained it was the pain in her joints, hearing loss, inability to drive to a job; inability to see, stomach issues, fatigue, low blood sugars, and migraines. Tr. 1633-1634.

Barnhart indicated she was first diagnosed with fibromyalgia when she was 19 years old and then again in 2013. Tr. 1634-1635. She reported pain in her knees, neck and hips. Tr.

1634-1635.  She had frozen shoulder in her right shoulder for about 11 months that resolved with physical therapy.  Tr. 1634-1635.  She has also had issues with her left shoulder.  Tr. 1635-1636.

Barnhart relayed that she had two hearing aids that she wore almost all the time.  Tr. 1636-1637.  She has migraines three or four times each week and sometimes seven days each week.  Tr. 1641.

Barnhart has diabetes and stomach issues which require her to have to be very careful about what she eats and does not eat.  Tr. 1639.  She has experienced very low blood sugar, causing her to pass out and have seizures.  Tr. 1639-1640.  She passed out about a week prior to the hearing.  Tr. 1640.  Barnhart has a "life alert" that she can use if she is home alone and something happens but she noted that if she does pass out the "life alert" does not do her any good.  Tr. 1640.

Barnhart relayed that she has numbness and tingling and loss of feeling in her hands and feet.  Tr. 1651-1652.  She has weakness in her hands that impacts her ability to open things and she drops things.  Tr. 1652.  Barnhart once stepped on something that caused her to bleed but she did not feel it or realize it until her husband noticed she was bleeding.  Tr. 1652.  Barnhart sees a podiatrist.  Tr. 1652.  She has diabetic shoes; she has a splint that she sleeps in for a heel spur; and she has arthritis in her feet.  Tr. 1652.

With respect to her knee problems, Barnhart wears braces on her knees.  Tr. 1653-1654.  She has tried therapy and has received cortisone injections on a regular basis.  Tr. 1654.  The cortisone injections had provided Barnhart relief for a while but, she relayed that more recently they had not been working.  Tr. 1654.

Barnhart explained she had problems with standing and walking and sometimes with sitting for too long.  Tr. 1657.  She tries to walk because she has been told that it helps with her

joints.  Tr. 1657.  However, she explained that more recently walking had become very difficult.
Tr. 1657.  She estimated being able to walk about 25 minutes at most.  Tr. 1658.  After sitting for
a while, Barnhart has to straighten her knees or they will lock up.  Tr. 1658.

Barnhart had been prescribed Percocet for her pain and was supposed to take it four times
each day.  Tr. 1659.  However, she did not take it that often because she did not want to get
addicted.  Tr. 1659.  She takes it as needed.  Tr. 1659.  Medication side effects include fogginess
and excessive thirst.  Tr. 1659-1660.  She has difficulty concentrating and focusing when she
takes her medication.  Tr. 1660.

In addition to her pain medication and diabetes medication, Barnhart was taking
medication for neuropathy, gout, and migraines.  Tr. 1660-1661.

The ALJ asked Barnhart about medical records showing that she was unwilling to stay in
the hospital even thought her doctor recommended that she stay after she had arrived at the
hospital crying in pain.  Tr. 1641-1645.  Barnhart indicated that she had a fear of staying
overnight in hospitals because one time she was taken to the hospital due to extremely elevated
blood sugar and ended up in a diabetic coma and in the hospital for months.  Tr. 1644-1645.

As far as her daily activities, Barnhart relayed that sometimes the pain in her knees is so
bad that she cannot get to the stairs to go downstairs in the morning.  Tr. 1647.  She tries to make
lunch for herself which usually is a sandwich.  Tr. 1647-1648.  Barnhart could not use a
computer because she cannot see the screen no matter how much the resolution is enlarged.  Tr.
1648.  She goes out to the store and sometimes to the zoo or park with her family but her
husband is with her to help her with the shopping or walking.  Tr. 1649-1650.  Barnhart and her
husband go to church and restaurants.  Tr. 1650.  Barnhart does not have any problems eating as
a result of her vision problems.  Tr. 1650.  She just has to be careful about what she eats because

of her stomach issues.  Tr. 1650.  Barnhart's husband takes care of their cats and fish and he takes care of paying the bills.  Tr. 1650-1651.  Because of her vision problems, Barnhart needs assistance with cooking.  Tr. 1638.  Also, she has difficulty climbing stairs; she ends up falling because she cannot see the steps very well and misses steps.  Tr. 1638.  Taking her insulin is also difficult due to her vision problems.  Tr. 1638.  With her husband's assistance, Barnhart tries to help with laundry.  Tr. 1646.  She also tries to help with doing the dishes.  Tr. 1646.

### January 2018 hearing

Barnhart got her driver's license in March 2017 and she drives "[o]ccasionally, only when necessary, never at night."  Tr. 1541.  Barnhart drove herself to the hearing alone.  Tr. 1541.  Her house was about an hour from the location of the hearing.  Tr. 1541.  When Barnhart drives, she has to allot herself enough time in case she has to stop because of a drop in her blood sugar.  Tr. 1541-1542.  She left for her hearing about an hour and forty-five minutes prior to the hearing.  Tr. 1542.  She had to stop during her trip to the hearing.  Tr. 1542.

When the ALJ asked Barnhart what prevented her from doing any kind of work, she indicated that her health was very unpredictable, causing her to have to reschedule appointments on occasion because she is unable to travel out of the house.  Tr. 1543, 1544.  Also, Barnhart is unable to sit and stand for long periods of time due to degenerative disc disease in her back.  Tr. 1543.  Barnhart's doctors have told her that there is nothing they can do for her back issues, explaining to her that her condition is degenerative and will keep getting progressively worse.  Tr. 1543.  Additionally, Barnhart explained that her blood sugar is very unstable; her blood sugar drops frequently and, she cannot do anything except wait until her blood sugar rises back up.  Tr. 1543.  Barnhart relayed that she had surgery on both her knees but it has not helped because she still has problems walking, sitting and standing.  Tr. 1543.  Barnhart also has chronic migraines.

Tr. 1543.  She tried Botox injections and they helped temporarily but her insurance no longer covered them.  Tr. 1543-1544.  Barnhart also has fibromyalgia, causing her chronic pain.  Tr. 1544.

When Barnhart's sugar is low, she gets moody; she has hot flashes; and her vision gets very blurry.  Tr. 1559.  Barnhart has low blood sugars several times a day.  Tr. 1559.  When her vision is affected by low blood sugar, Barnhart cannot see at all – she cannot see to drive or see to watch the television.  Tr. 1559.  As a result of her diabetes, Barnhart also has peripheral neuropathy that causes pain and numbness in her hands and feet; and it causes her toes to turn black so she has to be very careful.  Tr. 1560.  She is very prone to frostbite.  Tr. 1560.  Barnhart has pain and numbness almost every day.  Tr. 1561.  The pain and numbness in Barnhart's hands along with her trigger finger make it difficult for her to hold objects, such as scissors and pens, and it is hard for her to even make a fist.  Tr. 1561.  She no longer has strength in her hands.  Tr. 1561.

Barnhart's fibromyalgia cases her pain all the way down from her neck to her hips.  Tr. 1562.  She is not sure whether the fibromyalgia is causing her problems in her knees but from her hips all the way up to her neck, she has burning, stabbing, aching pains.  Tr. 1562.  Her fibromyalgia pain is worse with activity and with lying down.  Tr. 1562.

Barnhart experiences migraines that last five or six days and she has them for over half the month.  Tr. 1562.  She has medication for her migraines but one medication makes her feel worse and the other medication does not always help.  Tr. 1562.  The migraines cause Barnhart to vomit and she usually has to lie down in a dark room with ice on her head in silence.  Tr. 1562-1563.

Barnhart has also been diagnosed with ulcerative colitis and diverticulosis which along with her migraines cause diarrhea, constipation and vomiting. Tr. 1563-1564.

Barnhart indicated that she could not recall the last time she was pain free.  Tr. 1544.  Her pain is worse when the weather is colder.  Tr. 1544.  Also, her pain is worse with activity such as walking and standing.  Tr. 1545.  She also has pain with sitting.  Tr. 1545.  Barnhart receives treatment from the Crystal Clinic for her back pain, knee pain, shoulder pain, and trigger finger in her right hand.  Tr. 1548.  She receives treatment for her fibromyalgia through pain management at Union Hospital.  Tr. 1548.  Her pain management physician at Union Hospital has prescribed Percocet and Flexeril.  Tr. 1548.  Her pain management physician has explained that there was nothing else that he could do for her but he was the one who recommended that she see specialists at Crystal Clinic.  Tr. 1548-1549.

Barnhart sees her family physician, an internal medicine specialist, for her diabetes.  Tr. 1549.  She was trying to find an endocrinologist near her home but had not been able to find one covered by her insurance.  Tr. 1549.

Barnhart does not do a lot on a typical day.  Tr. 1554.  Barnhart's husband has to help her brush her hair because of her shoulder problems.  Tr. 1555-1556.  If Barnhart's knees and back are really bad, her husband has to help her get in and out of the shower.  Tr. 1555.  Barnhart's husband had been doing the cooking for about a year and a half.  Tr. 1556.  Her children are able to prepare simple things to eat.  Tr. 1556.  Barnhart tries to help with cleaning but cannot do very much to help.  Tr. 1556.  Barnhart visits with her parents approximately every three months.  Tr. 1557.  Barnhart used to enjoy watching movies but she cannot hear very well or sit and stay focused.  Tr. 1557.  Barnhart also used to enjoy sewing but she cannot sit very long.  Tr. 1557-1558.  She last sewed more than a year prior to the hearing.  Tr. 1558.  She tries to go to church

on Sunday provided that she does not have a migraine or her back or knees are not too sore.  Tr. 1558.

### 2.    Vocational Expert

A Vocational Expert ("VE") testified at the January 2018 hearing.[4]  Tr.  1566-1570.   The ALJ informed the VE that there was no past work that he was considering.  Tr. 1566.

For his first hypothetical, the ALJ asked the VE to assume a hypothetical individual of Barnhart's age and with her education who is limited to a range of light work with the following additional limitations: frequent reaching overhead and in other directions bilaterally; frequently handling and fingering bilaterally; frequently climbing ramps and stairs; occasionally climbing ladders, ropes, or scaffolds; frequently balancing, stooping, kneeling, crouching, and crawling; ability to avoid ordinary hazards in the workplace like boxes on the floor or doors ajar; no exposure to unprotected heights, moving mechanical parts, or operating a motor vehicle; and would require a moderate noise environment.  Tr. 1567-1568.  The VE indicated that there would be light jobs available that the described individual could perform, including wireworker, electronics worker, and bench assembler.  Tr. 1568.  The VE provided job incidence data for each of the identified jobs.  Tr. 1568.

For his second hypothetical, the ALJ asked the VE to consider the first hypothetical but with the additional limitation that the individual would be limited to simple, routine tasks and occasional contact with supervisors, coworkers, and the public.  Tr. 1568.  With that addition, the VE indicated that the same jobs would remain available.  Tr. 1568-1569.

The VE indicated that for the jobs identified employers would tolerate an employee being off task up to 10% of the time.  Tr. 1569.  As far as employers' tolerance for absenteeism, the VE

---

[4] A VE also testified at the August 2015 hearing.  Tr. 1664-1670.

indicated that if an employee was absent more than one day a month there would be no jobs available.  Tr. 1569.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[5] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[6] claimant is presumed disabled without further inquiry.

---

[5] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[6] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his March 20, 2018, decision, the ALJ made the following findings:[7]

1.      Barnhart last met the insured status requirements on September 30, 2017.  Tr. 1511.

2.      Barnhart did not engage in substantial gainful activity during the period from her alleged onset date of April 26, 2012, through her date last insured of September 30, 2017.  Tr. 1511.

3.      Through the date last insured, Barnhart had the following severe impairments: degenerative disc disease ("DDD"), osteoarthritis – bilateral knees, fibromyalgia, diabetes mellitus ("DM") with neuropathy, tendinitis – bilateral shoulders, migraine headaches, some decrease in visual acuity and hearing loss.  Tr. 1511-1514.

4.      Through the date last insured, Barnhart did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 1514-1515.

---

[7] The ALJ's findings are summarized.

5.    Through the date last insured, Barnhart had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following additional limitations: Barnhart can frequently reach in all directions, including overhead, with the left and right upper extremities; she can handle and finger items frequently with both hands; she can frequently climb ramps and stairs but she can only occasionally climb ladders, ropes, or scaffolds; she can frequently balance, stoop, kneel, crouch, and crawl; she is able to avoid ordinary hazards in the workplace -- such as boxes on the floor and doors ajar; she can never work at unprotected heights or around moving mechanical parts; she can never operate a motor vehicle; and she can only work around moderate noise.  Tr. 1515-1517.

6.    Through the date last insured, Barnhart was unable to perform any past relevant work.  Tr. 1517.

7.    Barnhart was born in 1982 and was 35 years old, which is defined as a younger individual age 18-49, on the date last insured.  Tr. 1517.

8.    Barnhart has at least a high school education and is able to communicate in English.  Tr. 1518.

9.    Transferability of job skills is not material to the determination of disability.  Tr. 1518.

10.   Through the date last insured, considering Barnhart's age, education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that Barnhart could perform, including wire worker, electronics worker, and bench assembler.  Tr. 1518-1519.

Based on the foregoing, the ALJ determined that Barnhart had not been under a disability, as defined in the Social Security Act, from April 26, 2012, through the date last insured.  Tr. 1519.

## V. Plaintiff's Arguments

Barnhart argues that reversal and remand is required because the ALJ's decision does not consistently and clearly address and explain the ALJ's findings relative to Barnhart's visual impairment.  Doc. 19, pp. 2, 19-20.  Barnhart also argues that the ALJ's evaluation of her fibromyalgia is inconsistent and insufficient.  Doc. 19, pp. 2, 20-24.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### B.    The undersigned recommends that the Court find no error in the ALJ's consideration of Barnhart's visual impairment

Barnhart argues that reversal and remand is required because the ALJ's analysis of Barnhart's visual impairment is inconsistent and his reasoning cannot be followed because the ALJ found "decrease in visual acuity" to be a severe impairment but also found that Barnhart's

"alleged vision loss causes few limitations on her ability to perform basic work-related activities and is therefore <u>nonsevere</u>" and stated that "[a]lthough her vision problems are not disabling, I have given her some minor limits in this regard."  Doc. 19, pp. 19-20 (quoting from Tr. 1511-1513) (emphasis in Plaintiff's brief).  The undersigned finds that the foregoing statements are not inconsistent.  The ALJ's decision makes clear that, while he did not find Barnhart's claim that she was legally blind supported by the record, he found that the record supported some decrease in Barnhart's visual acuity.

In reaching these findings, the ALJ discussed in detail evidence regarding Barnhart's visual impairment.  Tr. 1512-1513.  For example, the ALJ considered opinions rendered by consultative examiners Dr. Barchiesi and Dr. Zewail as well as the opinion of Dr. Bucher who reported seeing Barnhart once in 2015. Tr. 1512-1513.  When discussing Dr. Barchiesi's opinion and Dr. Zewail's opinion, the ALJ stated:

> Dr. Barchiesi noted that even with best correction, the claimant could only finger count on visual field testing.  However, despite this apparently very severe vision loss, the claimant had no difficulty walking around and navigating corners in the office.  In addition, she had no difficulty grabbing and handling objects.  Dr. Barchiesi noted that there was no evidence of diabetic retinopathy.   She did not diagnosis the claimant with any visual impairment.   (Exhibit 52F).

Tr. 1512.

> In December 2013, consultative examiner Dr. Aly Zewail opined that the claimant is extremely limited in seeing.  (Exhibit 42F)[.]  I give very little weight to this opinion because Dr. Zewail did not administer any vision testing.  In addition, the objective medical evidence and the claimant's full range of daily activity are inconsistent with his opinion.

Tr. 1513

With respect to Dr. Bucher's opinion, the ALJ observed that Dr. Bucher opined that Barnhart would have significant visual limitations.  Tr. 1513.  The ALJ found that Dr. Bucher's opinion should not be assigned controlling weight because the record did not make clear that she

was a treating medical source.  Tr. 1513 (noting that the opinion stated that Dr. Bucher saw Barnhart at least once in 2015 but that visit did not establish a treating relationship and there were no treatment records from Dr. Bucher in the record).   Instead, the ALJ found that that the opinion was entitled to very little weight for a number of reasons.  Tr. 1513.  The ALJ explained those reasons, stating:

> First, it is inconsistent with the medical evidence.  The records discussed above suggest the results of visual acuity testing and visual field testing are unreliable.  The unreliability of these tests are supported by the normal ocular examinations and the failure of any ophthalmologist to diagnosis the claimant with a vision impairment.   Finally, the opinion is inconsistent with the claimant's full range of daily activity.

Tr. 1513.

Barnhart does not raise a specific challenge to the ALJ's consideration or weighing of these opinions and the undersigned finds that the ALJ sufficiently considered and explained his evaluation of the opinion evidence.

In addition to considering the medical opinion evidence regarding Barnhart's alleged visual impairment, the ALJ took into account eye examinations, objective observations made by examiners, Barnhart's subjective statements regarding her vision, and Barnhart's activities of daily living.  Tr. 1512-1513.  For example, the ALJ acknowledged that there were "several visual acuity tests and visual field tests in the record, which appear to corroborate her [visual] complaints.  Tr. 1512.  However, the ALJ found that the "test results conflict[ed] with the claimant's observed and reported physical activities[]" and "no tests ha[d] been able to explain what [wa]s causing the claimant's alleged vision loss."  Tr. 1512.  Additionally, the ALJ considered Barnhart's statement "that even with best correction she cannot tell the difference between people and when in public must follow the color of her husband's shirt so as not to get lost."  Tr. 1512.  However, the ALJ found the extreme limitations reported by Barnhart

unsupported by the evidence including the fact that Barnhart got her license back in March 2017 and drove herself to the hearing.  Tr. 1512-1513.  The ALJ explained, "It is implausible to believe that the claimant can barely identify shapes in front of her but remains able to drive a vehicle."  Tr. 1513.

Barnhart does not contend that the ALJ misstated or failed to consider evidence and a review of the decision makes clear that the ALJ thoroughly considered and weighed evidence regarding Barnhart's alleged visual impairment.  Although she contends that the ALJ's statements regarding her visual impairment are inconsistent, as discussed above, the undersigned finds otherwise.  The ALJ's decision makes clear that he did not find support for Barnhart's claim that she was legally blind or had complete vision loss but he did conclude that the evidence supported a finding that Barnhart had a severe impairment of "some decrease in visual acuity." Tr. 1511-1513.  Further, although the ALJ concluded that Barnhart's visual impairment was not disabling, he provided "some minor limits" to address the vision problems that he found supported by the record.  Tr. 1513, 1515.  As the ALJ explained, Barnhart had the RFC to "avoid ordinary hazards in the workplace – such as boxes on the floor and doors ajar[]" but she could "never work at unprotected heights or around moving mechanical parts [and] she could "never operate a motor vehicle[.]"  Tr. 1515.

The undersigned finds that the ALJ provided a thorough discussion and explanation for his findings relative to Barnhart's alleged visual impairment.  Barnhart has not shown that the ALJ's findings are unsupported by substantial evidence or that reversal or remand is warranted for further clarification regarding the ALJ's findings with respect to the extent of Barnhart's visual impairment.

Accordingly, for the reasons discussed herein, the undersigned recommends that the Court find that reversal and remand is not required for further proceedings regarding Barnhart's alleged visual impairment.

**C.    The undersigned recommends that the Court find no error in the ALJ's consideration of Barnhart's fibromyalgia**

Barnhart contends that the ALJ erred in his treatment of her fibromyalgia, arguing that the decision is internally inconsistent regarding the impairment and the ALJ's analysis of the impairment is legally insufficient.  Doc. 19, pp. 20-24.

Barnhart argues that the decision is internally inconsistent because the ALJ found that fibromyalgia was a severe impairment but implied that any physical and musculoskeletal limitations in the RFC were related to other physical impairments and not her fibromyalgia. Doc. 19, pp. 21-22.  And, Barnhart also states that the ALJ found that Barnhart did not have other symptoms of fibromyalgia, including fatigue, irritable bowel syndrome, cognitive limitations, depression, or anxiety.  Doc. 19, p. 21.

Barnhart also argues that the decision is legally insufficient because the ALJ appeared to discount the severity of the alleged fibromyalgia symptoms because there was a lack of objective diagnostic and clinical findings and the ALJ did not assess her credibility as required by Social Security Ruling 12-2p.  Doc. 19, pp.  22-23.  SSR 12-2p "provides guidance on how [to] develop evidence to establish that a person has a medically determinable impairment (MDI) of fibromyalgia (FM), and how [to] evaluate FM in disability claims and continuing disability reviews under titles II and XVI of the Social Security Act (Act)."  *Soc. Sec. Ruling, SSR 12-2p*; *Titles II & XVI: Evaluation of Fibromyalgia*, SSR 12-2P, 2012 WL 3104869, * 1 (July 25, 2012).

As Barnhart indicates, the ALJ found that one of Barnhart's severe impairments was fibromyalgia. Tr. 1511. However, a diagnosis of fibromyalgia does not in itself entitle a claimant to disability. *See Stankoski v. Astrue*, 532 Fed. Appx. 614, 619 (6th Cir. 2013) (citing *Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 806 (6th Cir. 2008)).

Furthermore, the ALJ did not ignore Barnhart's fibromyalgia or fail to explain his reasons for finding that her fibromyalgia alone or in combination with other impairments was not disabling or did not require greater limitations than those contained in the RFC. The ALJ explained:

> In reaching the conclusion that the claimant's impairments do not rise to listing level, I also considered the effect her DM and fibromyalgia has on her other impairments and on her ability to perform routine movement and necessary physical activity within the work environment. I also considered how her DM and fibromyalgia may cause long-term complications such as fatigue, pain, neuropathy, retinopathy, infections, or dementia that would affect her ability to function physically pursuant to Social Security Rulings 12-2p and 14-2p. Because the physical examinations contained in the record were mostly unremarkable, I do not find that the claimant's DM and fibromyalgia either singularly or in combination with her other medically determinable severe impairments results in limitations greater than those assessed in this opinion.

Tr. 1515.

> Turning specifically to the claimant's fibromyalgia, all pertinent diagnostic findings and clinical observations have been discussed above. Aside from a June 2014 finding of positive trigger points, all of the other objective evidence is pertinent to the claimant's DDD, osteoarthritis, DM, and tendinitis. However, Social Security Ruling 12-2p requires an Administrative Law Judge to consider other symptoms and conditions often found in fibromyalgia patients. These include fatigue, irritable bowel syndrome, cognitive limitations, depression, and anxiety. In the case at hand, there is no objective evidence of fatigue or irritable bowel syndrome. There is also no objective evidence of any cognitive impairment. Finally, as discussed earlier in this decision, the claimant's mental impairments are not severe.

Tr. 1517.

The ALJ considered Barnhart's allegations that her impairments, including fibromyalgia, caused back and knee pain, frozen shoulder, headaches and vision loss and considered the

functional limitations that she alleged.  Tr. 1516.  However, the ALJ found that the intensity, persistence, and limiting effects of her stated symptoms were not entirely consistent with the medical evidence and other evidence of record.  Tr. 1516.  Contrary to Barnhart's position, the ALJ did not rely solely on the absence of diagnostic testing and clinical findings.  While not contained specifically in his discussion regarding Barnhart's fibromyalgia, in reaching his decision, the ALJ considered Barnhart's activities of daily living which included her ability to groom and dress herself independently and move about.  Tr. 1512.  Also, the ALJ noted that Barnhart reported that she enjoyed taking walks and visiting the zoo with her family and she was able to drive herself to the hearing.  Tr. 1512-1513, 1514.  The ALJ also considered Barnhart's use of medication to control her pain and her indication that it allowed her to perform typical daily activities.  Tr. 1516-1517.  The ALJ's consideration of activities of daily living as well as medications used, is consistent with the guidance set forth in SSR 12-2p for evaluating the intensity and persistence of an individual's pain or other symptoms.  *See* SSR 12-2P, 2012 WL 3104869, * 5.

Barnhart's attacks on the ALJ's treatment of her fibromyalgia are conclusory.  She has not shown that the ALJ did not consider her allegations of pain.  Nor does she explain how the ALJ's RFC which limits her to light work with additional limitations, including reaching and handling limitations, postural limitations, and noise limitations, does not sufficiently account for her fibromyalgia related symptoms, including pain.

Considering the foregoing, the undersigned finds that Barnhart has not demonstrated that the ALJ erred in his evaluation of her fibromyalgia or in his assessment of her subjective allegations.  Further, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  The ALJ concluded that fibromyalgia was among Barnhart's severe impairments, proceeded with the sequential evaluation steps, and assessed an RFC that limited Barnhart to light work with additional physical and mental limitations.  While Barnhart disagrees with the ALJ's assessment of her RFC, she has not demonstrated that the RFC is unsupported by substantial evidence nor does she identify specifically what evidence supports greater RFC limitations stemming from her fibromyalgia than those found by the ALJ.

Accordingly, for the reasons discussed herein, the undersigned recommends that the Court find that reversal and remand is not required for further proceedings regarding Barnhart's fibromyalgia.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

October 28, 2020

*/s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).